**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| IN RE: | PEDER N. FALCH, | : | Chapter 7 |
| | | : | |
| | Debtor. | : | |
| | | : | Bky. No. 10-19993 ELF |
| | | : | |

# M E M O R A N D U M

## I.  INTRODUCTION

Debtor Peder N. Falch ("the Debtor") filed a voluntary petition under chapter 7 of the

Bankruptcy Code on November 17, 2010.  After the meeting of creditors was held on January 5,

2011, the chapter 7 trustee filed a no asset report.  On February 20, 2011, creditors Patrick and

Cynthia Young ("the Youngs") filed a motion to dismiss the case ("the Motion") pursuant to 11

U.S.C. §707(a).  In the Motion, the Youngs assert that cause for dismissal exists because the case

was not filed in good faith.

A hearing on the Motion was held and concluded on April 25, 2011.

For the reasons set forth below, the Motion will be granted.

## II.  FACTS

From 1987 to 2008, the Debtor operated a general contracting construction business,

European Construction, Inc. ("ECI").  For a number of years, ECI was successful and profitable.

In 1999, ECI took on a substantial construction project on a residence owned by the

Youngs.  At some point in the midst of the project, a dispute arose between the Debtor and the

Youngs.  This resulted in ECI terminating its involvement in the project before its completion.

At that time, the Debtor believed that the Youngs still owed ECI about $120,000.00.

Subsequently, the Debtor initiated litigation against the Youngs and they counterclaimed for

damages they alleged that they had suffered.  The litigation resulted initially in the entry of an

arbitration award in favor of the Youngs and against the Debtor and ECI in the amount of

$440,000 in October 2008.  After the Debtor challenged the arbitration award in a proceeding in

the Court of Common Pleas, Bucks County ("the State Court Action") the parties negotiated a

settlement. As a result of the settlement, in October 2010, judgment was entered in favor of the

Youngs and against the Debtor in the State Court Action in the amount of $295,008.00, plus

interest at 6% beginning August 31, 2008.

Beginning in 2004, ECI experienced several other setbacks that caused the business to

falter generally and that eventually led to the Debtor's personal bankruptcy filing.   ECI

encountered major problems on two separate construction projects arising from floods for which

there was no insurance coverage.  Some time in 2008, the Debtor ceased operating ECI.  As

ECI's financial condition deteriorated, so did the Debtor's second marriage and the Debtor

believes that the financial strain contributed to his marital difficulties.  As stated above, this

marriage, the Debtor's second, ended in divorce.  The Debtor's marital residence was sold in

connection with the divorce.  As a result of his divorce and the failure of ECI, the Debtor was left

with no savings.

In 2009, the Debtor obtained his present employment as the property manager of a 52 acre

residential estate in Blue Bell, PA.  The property is owned by a family that resides there in two

separate homes.  The family has formed a corporation, LA Corp., which serves as the Debtor's

employer.  The Debtor's salary is $150,000.00 per year.

Case 10-19993-elf   Doc 20   Filed 05/18/11   Entered 05/19/11 10:21:20   Desc Main
Document    Page 3 of 17

The property also includes a farmhouse, in which the Debtor has resided for the past two years.  The Debtor pays no rent for his housing.  While the Debtor eventually intends to move out of the farmhouse and purchase a new residence, he has taken no action to date to seek out and purchase a new home and has no specific timetable for doing so.  As far is he is aware, he may continue to live in the farmhouse indefinitely (while remaining employed as the property manager for LA Corp.).

The Debtor has been married and divorced twice.  He has two daughters from his first marriage, ages 19 and 21.  Both of his daughters are currently attending college.  The Debtor has two children from his second marriage, a son and a daughter, ages 8 and 6.

The evidence introduced at trial, including the Debtor's bankruptcy schedules, reveal the following information regarding the Debtor's personal financial condition at the time he filed this bankruptcy case and through the date of the hearing on April 25, 2011.

The Debtor's monthly income, after deductions for withholding taxes and a $246.83 contribution to a 401K plan is $7,809.44.  His current monthly expenditures are $7,742.23, leaving monthly net income of $67.21.[1]

The Debtor owns no real estate.  In Schedule B, the Debtor disclosed his ownership of: (1) a minimal amount of money in the form cash and bank accounts; (2) household goods; (3)

---

[1]      In the actual bankruptcy schedules filed with the court, the Debtor listed both his monthly income and monthly expenses as $1,100.00 lower than the amounts stated above in the text. This is because his employer, LA Corp,  deducted $1,100.00 from his pay in repayment of a loan made to the Debtor by an affiliated company, LEMA Associates, LP.  Although the deduction ceased after the bankruptcy case was filed, thereby increasing the Debtor's take-home pay, the Debtor intends to continue to repay the loan, which increases his monthly expenses by the same amount.  The significance of the loan and the Debtor's intent to repay it will be discussed in Part III., infra.

framed prints; (4) clothing; (5) an interest in a 401K plan; (6) his defunct business, ECI; and (7)

an entitlement to a federal tax refund of $500.00.  The Debtor valued all of these assets at

$6,649.34 in the aggregate and exempted all of them in Schedule C using the federal bankruptcy

exemptions.  See 11 U.S.C. §522(b)(3), (d).

In addition to the assets mentioned above, the Debtor owns a 2002 Cruisers Express 4050

("the Boat"), which he docks in Beach Haven, NJ.[2]  The Boat is 40 feet long, with 2 staterooms

(with bathrooms), a kitchen, washer, dryer and three television sets.  The Debtor values the Boat

at $170,000.00.  It is subject to lien held by Bank of America securing a loan with an unpaid

balance of approximately $178,000.00, an amount that exceeds the current value of the Boat.

The Debtor has maintained the monthly payments on the loan and intends to continue to do so.[3]

The monthly payments are $1,570.00.  The Debtor incurs monthly expenses of $750.00 for boat

slip fees, $300.00 for maintenance, $100.00 for insurance and an unquantified amount (but less

than $450.00 per month) for fuel.  Thus, the Debtor's ongoing expenses related to the Boat

---

[2]     At trial, the Youngs' attorney, with some justification, regularly referred to the Boat as "the yacht."  I will employ the less "loaded" word, "boat."

[3]     The Debtor explained that he intends to keep up with the payments due on the Boat in the hope that there will come a time when the value of the boat at least equals the unpaid balance of the loan so that he would be in a position to sell the boat and "break even."  In light of the potential benefit of successfully completing a bankruptcy case (i.e., the discharge of his personal liability on his debts), the Debtor could not explain what rehabilitative purpose would be served by holding on to the Boat until it could be sold at a price that would pay off the secured loan.  As an additional rationale for his desire to continue to pay the loan secured by the Boat, the Debtor also stated that he has a strong emotional attachment to the Boat because it is the only substantial asset that he has retained since the breakup of his marriage and the loss of his business, ECI.

While I accept the Debtor's sincerity in describing his personal feelings about the Boat, given the lack of economic rationality in continuing the loan payment, I infer that he also is motivated to keep the boat, at least in part, to benefit from the typical recreational pleasures that accompany the ownership and use of a boat.

-4-

exceed $2,700.00/month.

The Debtor owns a 2007 Lexus. He purchased the vehicle in September 2010, for just under $43,000.00. When he purchased the automobile, he traded in two vehicles (a 2003 Jaguar and a 2006 Lincoln Truck Mark LT), receiving a $23,600.00 credit toward the purchase price. After financing most of the balance of the purchase price with Lexus Financial Services, the Debtor was left with a monthly payment on his automobile loan of $419.79.

In Schedule D, the Debtor disclosed no secured creditors, other than Bank of America and Lexus Financial Services mentioned above, and no priority creditors.

In Schedule F, the Debtor listed four unsecured debts: (1) Benner & Wild, the law firm that represented him in his litigation with the Youngs ($4,000.00); (2) LEMA Associates, LP ("LEMA"), the entity affiliated with his employer ($45,995.11); (3) the Youngs ($295,008.00); and (4) Wells Fargo Bank ("Wells Fargo"), the lender that extended a line of credit to ECI ($48,021.06).

In his testimony, the Debtor explained that, after he was employed by LA Corp., the principal of LA Corp. generously agreed to lend him $60,000.00, which the Debtor used to pay off his then-existing credit card debt. The loan was extended by LEMA, another company controlled by LA Corp.'s principal. Before filing his bankruptcy case, by agreement, LA Corp. deducted $1,100.00 from his paycheck every month. Obviously concerned about the effect that discontinuing repayment may have on his employment,[4] the Debtor intends to continue to repay this loan, even if he receives a chapter 7 discharge. As a result, he included the $1,100.00 monthly payment as one of his monthly expenses in Schedule J. See also n.1, supra.

---

[4]        The Debtor testified that it would be "insane" for him to cease repaying the LEMA loan.

-5-

In Schedule J, the Debtor also listed monthly expenses for the support of his children.  He pays his second ex-wife $1,250.00 per month for support of his two younger children.  This support level was determined by agreement and is not the subject of a court order.  He also sends his two children who are attending college a total of $400.00 per month for their support.

# III.  DISCUSSION

## A.

Dismissal of chapter 7 cases is governed by 11 U.S.C. §707.  As our Court of Appeals pointed out in In re Perlin, 497 F.3d 364, 370 (3d Cir. 2007), two separate subsections of §707 are potentially applicable to a request for a dismissal of a chapter 7 case.

> [S]ubsection (a) governs the dismissal of all bankruptcy filings, when adequate "cause" has been shown, and subsection (b) governs the dismissal of only those bankruptcy filings involving primarily consumer debts, when granting relief would be an "abuse" of Chapter 7.

Id.

The parties agree that this case does not involve a debtor with primarily consumer debts. Therefore, the Youngs' request for dismissal must be evaluated under 11 U.S.C. §707(a).

Section 707(a) provides:

> (a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including—
>
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
>
> (2) nonpayment of any fees or charges required under chapter 123 of title 28; and

> (3) failure of the debtor in a voluntary case to file, within fifteen days or such
> additional time as the court may allow after the filing of the petition
> commencing such case, the information required by paragraph (1) of section
> 521(a), but only on a motion by the United States trustee.

11 U.S.C. § 707(a).

While §707(a) nowhere mentions the lack of good faith as a ground for dismissal, it is

settled law in this Circuit that "[s]ection 707(a) allows a bankruptcy court to dismiss a petition

for cause if the petitioner fails to demonstrate his good faith in filing." In re Tamecki, 229 F.3d

205, 207 (3d Cir. 2000).

The decision whether to dismiss a chapter 7 case for lack of good faith is committed to

the discretion of the bankruptcy court. Id. That discretion is not without its limits. In fact, as a

general proposition, dismissal for lack of good faith is a narrow doctrine.

> Dismissal based on lack of good faith . . . should be confined carefully and is
> generally utilized only in those egregious cases that entail concealed or
> misrepresented assets and/or sources of income, lavish lifestyles, and intention to
> avoid a large single debt based upon conduct akin to fraud, misconduct or gross
> negligence.

Id. (quoting In re Zick, 931 F.2d 1124, 1129 (6th Cir. 1991)).

In Tamecki, the court also held that once a movant "calls into question" a debtor's good

faith, it becomes the debtor's burden to establish that the petition was filed in good faith. Id. at

207.[5]

---

[5]    It may not be entirely clear what a movant must do to "appropriately put at issue," 229
F.3d at 208 (Alito, J., concurring), a debtor's good faith so as to shift the burden to the debtor. In
Tamecki, the panel concluded that where the debtor had much greater access to the relevant facts, the
facts that were known to the movant (and presumably made part of the hearing record) were sufficient to
meet the objector's burden of production "[u]nder the particular circumstances of this case." Id.

Here, I am satisfied that the Youngs' showing that the Debtor has more than $2,700.00
(continued...)

In Perlin, the Court of Appeals directed the bankruptcy courts in this Circuit to consider the totality of the circumstances approach under §707(a) in evaluating whether a debtor has filed his or her case in good faith.  497 F.3d at 372 ("An assessment of a debtor's good faith requires consideration of all of the facts and circumstances surrounding the debtor's filing for bankruptcy").  The Perlin court also specifically held that the good faith inquiry may include a consideration of the debtor's substantial income and expenses:

> While the legislative history [of §707(a)] makes clear that a debtor's ability to repay his debts is inadequate cause for dismissal, we do not read the history as prohibiting a bankruptcy court from considering a debtor's substantial income and expenses in determining whether the debtor filed his bankruptcy petition in good faith.

Id.

At the same time, however, the court cautioned:

> to avoid undercutting congressional intent, a bankruptcy court's ultimate finding of bad faith may not be based exclusively or primarily on a debtor's substantial financial means. Otherwise, dismissal would essentially be based upon a debtor's mere ability to repay, which is expressly prohibited by the legislative history.

Id. at 374.

In the end, Perlin instructs that a debtor's substantial income and ability to repay creditors, combined with some other factor that suggests a lack of good faith, is sufficient for dismissal under §707(a).  Some examples offered by the court were: a lavish lifestyle,[6]

---

[5](...continued)
and possibly more than $4,000.00 per month of income that may be characterized as discretionary income satisfies their initial burden of production, as set forth in Tamecki.  The Youngs have "called into question" the Debtor's good faith, placing the burden of proof  on the Debtor to establish his good faith in this bankruptcy proceeding.

[6]    I perceive some inherent tension between the proposition that a high income, by itself,

(continued...)

inaccuracies in the schedules filed with the bankruptcy court, pre-petition transfers of assets that appear designed to frustrate creditors, and conduct that appears to be designed to avoid payment of one particular creditor.  Id.; accord In re Glunk, 342 B.R. 717, 734 (Bankr. E.D. Pa. 2006).

In Glunk, I concluded, consistent with the later decided Perlin decision, that good faith under §707(a) required a consideration of the totality of the circumstances.  I also stated that a bankruptcy court may consider the following factors:

1. the debtor's (extravagant) lifestyle and ability to pay.

2. the disproportionate impact that bankruptcy relief would have on one particular creditor, or only a few creditors, as compared to other creditors.

3. forum shopping or efforts to manipulate the judicial process to thwart the orderly determination of a creditor claim pending in another court.

4. prepetition fraudulent conduct to place assets beyond the reach of creditors or less than full and candid disclosure in the bankruptcy process itself.

5. an end result, if bankruptcy relief is permitted, that is perceived to be fundamentally unfair or excessive.

Glunk, 342 B.R. at 734.

---

[6](...continued)
does not justify dismissal under §707(a) and the proposition that high income combined with a lavish lifestyle may justify a §707(a) dismissal.  One wonders, for example, how a chapter 7 debtor can have a very high income (substantially in excess of the amount necessary to support a comfortable lifestyle) without having a lavish lifestyle?  Does it depend on precisely how the debtor uses the "excess" income?  Perhaps cases in which a high-income debtor uses the "excess" income to pay certain expenses that society generally considers worthy (e.g., support of indigent relatives who are not legal dependents, or large charitable contributions) as opposed to self-indulgent (e.g., maintaining multiple residences or spending vast sums on exotic vacations or simply accruing substantial savings for the later purchase of luxury items) are to be treated differently under §707(a).  The point here is that it may be difficult for the bankruptcy court to distinguish between a case involving "mere" high income and a case involving a lavish lifestyle.

With these principles in mind, I consider the Youngs' request for dismissal of this case.

## B.

In requesting dismissal of this case under §707(a), the Youngs have depicted the Debtor's bankruptcy filing as one in which the Debtor seeks to discharge debts that he could afford to repay in order to maintain an extravagant lifestyle. In support of this contention, they refer to:

- the Debtor's intention to continue expending more than $2,700.00 per month to pay for and maintain the Boat;

- his purchase of what they characterize as a "high end" Lexus automobile just a few months before seeking bankruptcy relief, although he could have secured reliable transportation through ownership of a less expensive vehicle, which would have not resulted in the unnecessarily high car loan payment of $419.00 per month;

- his intention to repay the LEMA loan of $1,100.00 per month;

- his monthly payments of $400.00 in support of his two, adult children attending college.

Based on these circumstances, the Youngs argue that the Debtor has more than $4,600.00 in income available each month that could be available for repayment of his unsecured debts. They suggest that the Debtor's failure to allocate any of this money to the only three creditors that would be adversely affected by this bankruptcy case (the Youngs, Benner & Wild and Wells Fargo) is indicative of his bad faith.

Another, somewhat more subtle aspect to the Youngs' challenge to the Debtor's good faith concerns the Debtor's proposed disparate treatment of different unsecured creditors. The Debtor has chosen to file a chapter 7 case. Yet, he wishes to pay back certain debts and discharge others. The Youngs have had a long-running dispute with the Debtor and they

represent 85% of the unsecured debt that will be discharged and not repaid voluntarily if this case

proceeds to discharge.[7]  They perceive this bankruptcy largely as an attempt to eliminate their

claim, while the Debtor otherwise continues "business as usual," despite the fact that he has a

substantial amount of discretionary income available every month.  Therefore, the Youngs ask

the court to find that the Debtor is manipulating the bankruptcy system to target them unfairly.

This second undercurrent in the Youngs' Motion suggests that they recognize that the

Debtor may be entitled to some degree of debt relief.  Thus, in seeking dismissal of this case, the

Youngs' complaint is less about the Debtor's decision to request bankruptcy relief from his debts

and is more about the choices he has made in shaping that bankruptcy relief.

The Debtor puts forth a number of responses.

The Debtor testified that, prior to the bankruptcy filing, he was willing to pay the Youngs

a sum of money that he considered to be substantial ($50,000.00) in order to settle their dispute

and that he filed his bankruptcy case only after concluding he did not see how he could manage

to pay the Youngs' $295,008.00 judgment entered in the State Court Action.  According to the

Debtor, his settlement offer demonstrates his good faith effort to reach an accommodation with

the Youngs prior to filing this bankruptcy case.  The import of this argument is that the Debtor

believes it proves that his bankruptcy filing was not just the latest (bad faith) tactic in his

personal vendetta with the Youngs in which he was prepared to take any action necessary to

prevent the Youngs from ever collecting any money from him.  Rather, he explains that his

---

[7]      Based on the Debtor's intention of repaying his secured car and boat loans and the
LEMA loan, if he were to receive a chapter 7 discharge, the three creditors most adversely affected
would be the Youngs, Benner & Wild and Wells Fargo.  The scheduled debt for those three creditors
totals $347,029.06.  The Youngs' debt represents 85% of that amount.

inability to settle with the Youngs combined with the entry of the judgment in the State Court

Action, was the straw that broke the camel's back and forced him into bankruptcy.[8]

In response to the Youngs' complaints about a lavish lifestyle, the Debtor has responded

with a justification for each of the expenses the Youngs have questioned.  The Debtor believes

that he needs to repay the LEMA loan to maintain good relations with his employer.[9]  He must

pay the Lexus automobile loan, with a monthly payment that he considers modest and

reasonable, in order to keep the vehicle that provides him with reliable transportation.[10]  While he

---

[8]    I found credible the Debtor's explanation that the culmination of his lengthy litigation with the Youngs with the entry of a large money judgment against him was the precipitating factor in his bankruptcy filing.  As I observed previously in Glunk, the need for bankruptcy relief may be caused by one particular event that upsets the equilibrium in a debtor's pre-bankruptcy economic life, such as a ruinous business transaction that contributes to the failure of a small business, leaving the debtor-principal with one particular large debt. Seeking a fresh start by filing a bankruptcy petition to obtain relief from such a burdensome debt is a conventional, traditional and acceptable use of the bankruptcy process.  See Glunk, 342 B.R. at 736.

However, while the Debtor adequately explained why he decided to request some type of bankruptcy relief was made in good faith, as discussed in the text, infra, that does not mean that he acted in good faith in the manner in which he sought to employ the remedies available to him under the Bankruptcy Code.

[9]    The Youngs point out that the LEMA loan was obtained to pay off the Debtor's existing credit card debts and that the Debtor listed no credit card debt in this bankruptcy case.  Thus, the Youngs suggest that even if repayment of the LEMA loan has some justification in that it protects the Debtor's employment income, it functionally results in full repayment of the Debtor's credit card debt without any repayment to them on their $295,000.00 claim.  They suggest that this disparate outcome is inequitable and inconsistent with the "equality of distribution to creditors" principle embedded in the Bankruptcy Code.  See generally Tamecki, 229 F.3d at 207 (good faith inquiry requires the court to consider whether the debtor is abusing the "purpose, or spirit of bankruptcy law").

[10]    The monthly payment on the car loan is $419.00.  If this were a chapter 7 case of a debtor with primarily consumer debts, in evaluating whether granting chapter 7 relief would be presumptively abusive under the "means test," the Debtor would be allotted an "ownership expense" of $496.00.  This amount is derived from the local transportation standards established by the United States,

(continued...)

may have no legal obligation to support his children presently attending college, he feels an

understandable strong moral obligation to assist them and, again, the amount he is providing

monthly is relatively modest.

## C.

Both parties make some valid points.  To decide this case, however, I need not further

parse and judge the merits of all of the parties' particular arguments.  As discussed with counsel

during the closing argument on April 25, 2011, the outcome in this case depends primarily on the

propriety and good faith of the Debtor's decision to allocate in excess of $2,700.00 per month to

pay the debt service and other expenses for the Boat.

The Youngs, of course, depict the Debtor's ongoing expenses for the Boat as a bad faith

attempt to maintain a luxurious lifestyle at the expense of his creditors.  In response, the Debtor

describes his plan to maintain the boat as a reasonable recreational expense that simply replaces,

at least in large part, the housing expense he would have if he were not in the fortunate position

of having employment that provides the fringe benefit of free housing.  He suggests that there

would be no complaint if, instead of paying for the boat, he was paying an equivalent amount of

---

[10](...continued)
Internal Revenue Service and made applicable by 11 U.S.C. §707(b)(2)(A)(ii) (I).  See
http://www.irs.gov/businesses/small/article/0,,id=104623,00.html.

While this comparison to the standard employed in evaluating abuse under §707(b) is
instructive, it is not conclusive.  As the Youngs point out, only two months before filing for chapter 7
relief, the Debtor purchased a high-end Lexus automobile for almost $49,000.00.  He may have needed
only a modest loan to pay for it, but that was because he traded in two vehicles and received a trade-in
credit of $23,600.  Undoubtedly, he could have purchased a different, less upscale, but nonetheless
reliable vehicle for less than $49,000 which, based on the value of his two trade-in vehicles, would have
resulted in a substantially lower car loan and monthly payment.

money each month to purchase and maintain a residence.

The difficulty with the Debtor's position is that he is not expending the funds for a home.
He is spending the money to retain ownership and use of a large boat for recreational use.  There
is no rational economic purpose served by retention of the Boat.  Whatever symbolic role the
Boat plays in the Debtor's inner emotional life, that factor does not outweigh the fact that the
Debtor proposes to pay more than $30,000.00 per year to retain and maintain the Boat while
certain creditors, to whom he owes substantial sums, go unpaid.

At least so long as the Debtor has the ability to live rent-free in the farmhouse on a 52
acre estate while earning more than $150,000.00 annually, good faith mandates that he make
some effort to repay his lawful debts.  The fact that he has the good fortune to have no present
housing expense does not justify the large expenditure to support his continued ownership and
use of the Boat.  If one were to substitute the expenditure of the same amount of money annually
for grand vacations to locations such as Tahiti, Australia or luxury hotels in the Caribbean, would
anyone seriously question that such expenditures demonstrate a debtor's lack of good faith in
seeking chapter 7 relief with no assets being distributed to creditors?

My conclusion regarding the Debtor's lack of good faith in seeking chapter 7 relief while
intending to retain the Boat finds support in case law regarding bankruptcy abuse under §707(b).
There are several reported cases in which proposed retention of and continued payment of
expenses related to a recreational boat appear as either a substantial or decisive factor in the
court's decision to dismiss the case for abuse under §707(b).  See In re Deutscher, 419 B.R. 42,
46-47 (Bankr. N.D. Ill. 2009); In re Boyle, 412 B.R. 108, 112-13 (Bankr. W.D.N.Y. 2009); In re
Engskow, 247 B.R. 314, 317 (Bankr. M.D.Fla. 2000); In re Rushing, 93 B.R. 750 (Bankr. N.D.

-14-

Fla. 1988).  But see In re Jensen, 407 B.R. 378 (Bankr. C.D. Cal. 2009) (chapter 7 debtors

proposed retention of home, motor home and boat, subject to secured claims of $800,000.00,

$60,000.00 and $30,000.00 respectively, all purchased before a substantial reduction occurred in

the Debtors' income, did not justify dismissal of case for abuse under §707(b)(3)).  Cf. In re

Honkomp, 416 B.R. 647, 650-51 (Bankr. N.D. Iowa 2009) (case not filed in bad faith where

debtor acknowledged that reaffirmation of $16,692.00 debt with monthly payments of $173.00

on boat was a mistake and debtor's monthly expenses exceeded his income by more than

$1,000.00); In re Sawatski, 1997 WL 33475156, at *7 (Bankr. C.D. Ill. July 31, 1997) (case not

filed in bad faith where debtors reaffirmed loan on boat that was not a "luxury craft" and that was

valued at $2,500.00).

    In Boyle, a case involving the court's consideration of the "totality of the circumstances"

under §707(b)(3), the debtors sought to reaffirm their secured purchase money loan on a 28 foot

boat that they purchased for $70,520.00.  When they filed their chapter 7 bankruptcy case, the

unpaid balance of the loan exceeded the value of the boat.  The debtors proposed to reaffirm the

debt and retain the boat, which would have required them to devote approximately $800.00 per

month of their monthly income for that purpose.  The court calculated that surrender of the boat

would have enabled the debtors to propose a chapter 13 plan with distribution of at least 25% and

possibly greater than 50% to their unsecured creditors.  In these circumstances, the court

concluded that granting bankruptcy relief would constitute an abuse of chapter 7 and allowed the

debtors the opportunity to convert the case to a chapter 11 or 13 before dismissing the case.

Boyle, 412 B.R. at 113.

    The facts here are much like those in Boyle.  However, the case for dismissal is even

stronger here in light of the higher value of and related monthly expenses for the Boat as compared to the boat in Boyle.

On the facts before me, I exercise my discretion much like the Boyle court.  I perceive the Debtor as being able to propose, without any deleterious impact on his financial rehabilitation, a chapter 13 plan in which he sells or surrenders the boat and devotes approximately $2,700.00 per month or more to repayment of his creditors.  I calculate that such a chapter 13 plan could result in a distribution of approximately 40% on the substantial amount of unsecured debt scheduled by the Debtor.[11]

Evaluating the facts of this case through the prism of the factors identified in Glunk, I conclude that the circumstances suggest that three bad faith factors come into play: (1) a lifestyle that is extravagant, at least insofar as the Debtor wishes to retain a large boat, with substantial current expenses, for recreational use; (2) the disproportionate impact that bankruptcy relief, as contemplated by the Debtor, would have on only a few creditors (and one creditor in particular, the Youngs); and (3) an end result that necessarily would be perceived as fundamentally unfair or excessive, if chapter 7 bankruptcy relief is permitted as requested by the Debtor.

Taken together, these factors are sufficient to convince me that, based on the totality of

---

[11]     If I assume that the Debtor can maintain all of the payments questioned by the Youngs, except for the Boat expenses, including full repayment of LEMA loan, see generally In re Orawsky, 387 B.R. 128 (Bankr. E.D. Pa. 2008), the Debtor should be able to afford at least $2,700.00 per month in chapter 13 plan payments.  Based on anticipated administrative expenses slightly  in excess of 10% (for the trustee commission and the Debtor's counsel's compensation, see 11 U.S.C. §330(a)(4)(B)), approximately $144,000.00 should be available for distribution to unsecured creditors (60 x $2,400.00).  Even if I were to add to the unsecured creditor class an additional $10,000.00 for the unsecured component of Bank of America's claim secured by the Boat, the likely total amount of allowed unsecured claims should be no more than approximately $357,000.00.  Thus, the distribution to unsecured creditors should approximate 40%.  The Youngs would receive approximately $118,000.00 on their claim.

-16-

circumstances, the Debtor lacks good faith in seeking relief under chapter 7 of the Bankruptcy

Code and that dismissal is appropriate under 11 U.S.C. §707(a).[12]

## IV.

For the reasons discussed above, the Youngs' Motion to Dismiss this case will be

granted.  However, as in In re Harmon, at *9 (Bankr. E.D. Pa. Feb. 16, 2011), I will enter an

order allowing the Debtor two (2) weeks to determine whether he wishes to convert this case to

chapter 13 or chapter 11.  If he fails to do so on or before June 2, 2011, the case will be

dismissed.


Date:  May 18, 2011

_____
ERIC L. FRANK
U.S. BANKRUPTCY JUDGE

---

[12]    In Glunk, I stated that it would be a rare case that would result in a bad faith finding
absent some pre-petition fraudulent conduct or some evidence of manipulation of the judicial process.
See 342 B.R. at 735.  There is no such evidence in this case.  However, as I also stated in Glunk, analysis
of bad faith is based on the totality of the circumstances, an inquiry that provides "the bankruptcy court
[with] the flexibility and authority, in an appropriate case, to dismiss a bankruptcy based on any of the
five categories."  Id.  In my judgment, the combined weight of the three factors referenced above in the
text warrants the outcome reached here.